# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TIMOTHY KOBELIA, *et al.*,

   *Plaintiffs*,

  v.

FEDERAL BUREAU OF
INVESTIGATION, *et al.*,

   *Defendants*.

Civil Action No. 24‑2542 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

  Timothy Kobelia and Kevin P. Tilley are former active agents with the Federal Bureau of Investigation (FBI). A few years ago, for unrelated reasons, they were suspended from their respective positions indefinitely and without pay. While their suspensions were pending, Mr. Kobelia began working for the United States Bureau of Prisons, and Mr. Tilley took a job at a local inspector general's office. But neither of them received permission from the Department of Justice before beginning this work even though federal regulations require Department employees to seek approval before starting outside employment. Mr. Tilley submitted a request years ago and has yet to hear back, and Mr. Kobelia never submitted a formal request at all. The Plaintiffs now challenge these outside-employment regulations under the Fifth Amendment, the First Amendment, and the Administrative Procedure Act (APA). They also challenge the Defendants' failure to act with respect to Mr. Tilley's years-old request for approval, alleging that this violates the APA as well. But the Court dismisses their claims. The Plaintiffs lack standing to bring most of their claims, and their APA claims are precluded by the Civil Service Reform Act (CSRA). The remaining claim fails on the merits. The Court therefore dismisses this case.

## BACKGROUND

### A.    Factual Background

The Court draws the facts, accepted as true, from the Plaintiffs' Complaint. *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023).

#### 1.    Timothy Kobelia

Mr. Kobelia began serving at the FBI in 2005. Compl. ¶ 8. He entered the Bureau as a special agent with a "Top Secret" security clearance, *see id.* ¶¶ 8–9, and he proceeded to build an impressive career investigating crime, *see id.* ¶ 11. He "received multiple U.S. Attorney awards," and he even had the honor of receiving a "citation from the FBI Director for conducting a child sex trafficking investigation during the Super Bowl in 2014." *Id.*

In 2021, Mr. Kobelia transferred to the FBI headquarters as a supervisory special agent in the Criminal Covert Operations Unit. *Id.* ¶ 12. And by the following year, the acting Deputy Assistant Director of the FBI Security Division (SecD) asked him to join the Division. *Id.* SecD has many responsibilities, but one of them is investigating and adjudicating security clearance matters for FBI employees. *Id.* ¶ 13. Mr. Kobelia eventually noticed various "abuses of the security clearance suspension and revocation process" within SecD, and he decided to make protected disclosures under the FBI whistleblower protection statutes and regulations. *Id.* ¶ 14 (citing 5 U.S.C. § 2303; 28 C.F.R. § 27.2).

In late March or April 2023, Mr. Kobelia received an email announcing various wellness activities for SecD employees, like "Lunch and Coloring" and "Office Yoga." *Id.* ¶ 15. He sent a photo of the email to a colleague at the FBI, and to his surprise, a former FBI employee who commonly criticizes the Bureau tweeted a similar image. *Id.* Mr. Kobelia did not intend for this to happen, nor did he ever authorize the sharing of the image. *Id.*

Months later, in June or July 2023, Mr. Kobelia met with some fellow employees, including a SecD assistant section chief. *Id.* ¶ 16. Mr. Kobelia believed that this individual "routinely abused the security clearance suspension and revocation process." *Id.* For example, the assistant section chief opposed reinstating an employee's security clearance even though it was previously revoked on the basis of national origin. *Id.* So Mr. Kobelia and his Unit Chief told the manager that they thought this was discrimination. *Id.* The next day, the assistant section chief "entered negative performance 'check-ins' for Kobelia and his Unit Chief in the FBI's personnel system." *Id.* His Unit Chief was forced out of the FBI by the end of September 2023. *Id.*

On September 20, 2023, SecD investigators interviewed Mr. Kobelia about the image from the spring. *Id.* ¶ 17. Mr. Kobelia admitted that he had sent an image of the email to a work friend, but he denied ever sharing it with the former FBI employee who popularized it. *Id.* The "SecD investigators told him that his clearance was being suspended not just for the release of the image but also for 'performance' issues and his 'attitude.'" *Id.* A polygraph test "indicated no deception when [Mr. Kobelia] denied that he had sent the image to the former FBI employee, intended it to be sent to him, or intended to embarrass the FBI." *Id.*

Later that day, FBI Executive Assistant Director Timothy Dunham gave Mr. Kobelia a letter notifying him that his security clearance was suspended. *Id.* ¶ 18. The letter explained that the suspension was "based on security concerns" and that it would continue "until the FBI investigation of the underlying matter is completed." *Id.* It also stated that "[t]he suspension of an employee's access to classified information results in loss of access to controlled FBI space." *Id.* The letter continued by saying that his "authority to fulfill the duties and responsibilities of [his] position [were] also suspended." *Id.* Shortly thereafter, Mr. Kobelia was "indefinitely suspended

from duty with the FBI without pay[.]" *Id.* ¶ 19. After using his accrued leave, he received his final

paycheck from the FBI on April 20, 2024. *Id.* ¶ 20.

Without a source of income, Mr. Kobelia began looking for other employment. *See* Compl.

¶¶ 71–78. But several federal regulations apply to Department of Justice employees who seek

outside employment. *Id.* ¶¶ 47–50. For example, 5 C.F.R. § 2635.802 provides that "[e]mployees

may not engage in outside employment or any other outside activity that conflicts with their official

duties." *Id.* And 5 C.F.R. § 3801.106(b)(1) prohibits employees from engaging in outside

employment involving "[a]ny criminal or habeas corpus matter, be it Federal, State, or local." *Id.*

But this prohibition on law enforcement work can be waived in writing "based upon a

determination that the activities covered by the waiver are not expected to involve conduct

prohibited by statute or Federal regulation." 5 C.F.R. § 3801.106(b)(2). Even some non-law

enforcement work is regulated too, with 5 C.F.R. § 3801.106(c) providing that "[a]n employee

must obtain written approval before engaging in outside employment, not otherwise prohibited by

paragraph (b) of this section that involves: (i) the practice of law; or (ii) [a] subject matter, policy,

or program that is in his component's area of responsibility." *Id.* The upshot of these restrictions

is that Department of Justice employees must seek prior approval before accepting outside

employment in law enforcement or in a field related to their responsibilities at the Department.

In the face of these restrictions, Mr. Kobelia accepted a law enforcement role without

approval. *See* Compl. ¶¶ 76–77. In February 2024, as his accrued leave was about to run out, *see id.*

¶ 20, Mr. Kobelia talked with Curtis Steuber, an attorney at the FBI's Office of Integrity and

Compliance (OIC), about the possibility of working at the United States Bureau of Prisons (BOP),

*id.* ¶ 71. Mr. Steuber told Mr. Kobelia that all FBI employees are subject to the prohibition on

outside law enforcement work and that Mr. Kobelia "might be prohibited from working for BOP

under § 3801.10(b)(1)(ii) or (iii)." *Id.* ¶ 73. Mr. Steuber later told Mr. Kobelia that the FBI would not approve any employment at the BOP. *Id.* ¶ 75. So Mr. Kobelia did not bother submitting a request for approval, *id.* ¶ 76, and instead began working at the BOP on April 21, 2024, *id.* ¶ 77. "He took the BOP job so he could subsist and continue his law enforcement career." *Id.*

There was one hiccup, though. Mr. Kobelia's first BOP paycheck was delayed because he was administratively listed as an FBI employee. *Id.* "After BOP officials communicated with the FBI, BOP received an SF-50 form from the FBI indicating that [Mr.] Kobelia had transferred to another federal agency." *Id.* Mr. Kobelia never requested the transfer from the FBI. *Id.* But on August 14, 2024, through counsel, Mr. Kobelia "received an email indicating that the FBI Human Resources Division considered [Mr.] Kobelia transferred to another federal government agency, which resulted in his separation from FBI employment, effective April 21, 2024." *Id.* ¶ 78. "Thus, he was removed from the rolls of the FBI." *Id.*

### 2. Kevin P. Tilley

Now we turn to Mr. Tilley. He entered the FBI as a special agent with a "Top Secret" security clearance in July 2018. *Id.* ¶¶ 21–22. "After completing new agent's training at Quantico, Virginia, [Mr.] Tilley was assigned to the FBI's field office in Seattle, Washington[,] where he was assigned to investigate crimes against children and human trafficking." *Id.* ¶ 24. Even though he had a security clearance, none of his work required him to access classified material. *Id.* ¶ 25.

Around March 14, 2021, Mr. Tilley learned that a complaint had been filed against him at work. *Id.* ¶ 26. He was placed on administrative leave for about two weeks. *Id.* ¶ 27. Later, in June 2021, investigators from the DOJ Office of the Inspector General (OIG) and a detective from the Seattle Police Department interviewed him. *Id.* ¶ 28. In September 2021, OIG told Mr. Tilley's lawyer that the police investigation was closed. *Id.* ¶ 29. And by October 2021, the local

prosecutor's office notified Mr. Tilley that it had declined to charge him with any crime, providing a declination decision dated October 8, 2021. *Id.* ¶ 30. Mr. Tilley told his supervisor and the special agent in charge of the Seattle Division about this declination, and on November 4, 2021, he was placed on administrative leave again. *Id.* ¶¶ 31–32.

By November 19, 2021, Mr. Tilley's security clearance was suspended. *Id.* ¶ 33. And on November 22, 2021, someone in the FBI Human Resources Branch wrote Mr. Tilley a letter explaining that his clearance was suspended because of the same complaint that the local prosecutor had recently declined to prosecute. *Id.* ¶ 34. She wrote that Mr. Tilley's clearance suspension "will continue until the FBI investigation of the underlying matter is completed," and that "[a]t that time, [his] clearance status will be re-evaluated, and [he] will be advised accordingly." *Id.* ¶ 35. Much like the letter Mr. Kobelia received, this letter also explained that Mr. Tilley would lose access to FBI space as well as the authority to fulfill the duties of his position. *Id.* ¶ 36.

The same day, on November 22, 2021, Mr. Tilley received a second letter from someone else in the FBI Human Resources Division. *Id.* ¶ 37. This one advised that he was "suspended indefinitely from duty and pay[.]" *Id.* It explained that this was because his security clearance was suspended. *Id.* And it said that his "suspension will be in effect pending the final resolution of all security actions including investigation, adjudication, and any related appeals regarding [his] eligibility for access to classified information, and/or a determination of whether or not further administrative action is warranted." *Id.* Two days later, Mr. Tilley confirmed with the local prosecutor's office that it had declined to charge him with any crime. *Id.* And he received his final FBI paycheck in February 2022. *Id.* ¶ 39. After his suspension, he was not able to access any medical benefits offered to him as a federal employee. *Id.* ¶ 40.

Attached to Mr. Tilley's suspension letter was a document outlining the regulations governing outside employment for Department of Justice employees. *Id.* ¶ 43. This document—an FBI FD-331 Special Agent Request to Engage in Outside Employment Proxy Form—asks a series of questions about possible new employment, and if the answer to any of those questions is "yes," it instructs the reader to consult an OIC ethics attorney before proceeding. *Id.* ¶ 43. It also has a series of statements with checkboxes for the reader to acknowledge before pursuing outside employment. *See id.* ¶ 44. For example, the reader needs to acknowledge that "my outside employment will not be started until officially approved." *Id.* The document also summarizes the regulations on outside employment: "[R]egulations and statutes prevent the Division Head or the [Human Resources Division Assistant Director] from approving outside employment . . . [w]ith a foreign government . . . ; involving the practice of law; law enforcement outside the FBI; requiring a polygraph; or employment with another Federal Agency." *Id.* ¶ 45.

On January 10, 2022, Mr. Tilley sought approval to work for a government contractor. *Id.* ¶ 56; *see also id.* ¶ 57. But his supervisor in the Seattle Division told him that he could not approve the request or share the reason for the denial. *Id.* ¶ 56. His supervisor then said that if he were in Mr. Tilley's shoes, he would take the job. *Id.* Mr. Tilley took that advice. "Although he was uncertain if the FBI would take action against him for taking a new job, on January 24, 2022, [Mr.] Tilley began employment with [the] government contractor." *Id.* ¶ 57.

In August 2022, presumably while still working for the government contractor, Mr. Tilley applied to be a trainee deputy sheriff at the Orange County, California Sheriff's Department. *Id.* ¶ 59. But after disclosing that the FBI and OIG were still looking into an allegation against him, a background investigator told him that neither the Sheriff's Department nor any other police agency would hire him with a pending internal investigation. *Id.* Then in October 2022, Mr. Tilley

lost his job with the government contractor. *Id.* ¶ 60–61. He believes the FBI had something to do with this. *Id.* ¶ 60.

On December 12, 2022, Mr. Tilley received an offer to work at the Office of the Inspector General of the Los Angeles County Metropolitan Transportation Authority (LA Metro). *Id.* ¶ 62. He submitted a request for outside employment to the FBI, and he began working at LA Metro on December 19, 2022. *Id.* ¶¶ 63–64. Then on January 6, 2023, Mr. Tilley was told that he needed to speak with an FBI OIC ethics attorney about his request. *Id.* ¶ 65. Attorney Chris Steuber spoke with Mr. Tilley and then sent him an email to memorialize the conversation. *Id.* In that email, Mr. Steuber wrote: "Last but not least, to manage expectations, we spoke about the likelihood that this proposed employment will be denied under DOJ Supplemental Regulations pursuant to 5 C.F.R. [§] 3801.106[,] which prohibits outside employment that includes criminal matters at the Federal, state, or local levels." *Id.* Mr. Tilley had emphasized during the conversation that the role would not be a law enforcement role because he would have to refer any criminal activity to local law enforcement, "just like any other citizen[.]" *Id.* But Mr. Tilley nevertheless submitted a request for a waiver of the outside-employment restrictions on law enforcement work under 5 C.F.R. § 3801.106(b)(2). *Id.* ¶ 66.

Meanwhile, Mr. Tilley tried to apply to become a state trooper with the Arizona Department of Public Safety—a position he had previously held. *Id.* ¶ 67. But the application process involved answering whether he was the subject of any investigation, and he learned that answering "yes" would be fatal to his chances of employment. *Id.*

In April 2024, after having worked at LA Metro for about a year and four months, Mr. Tilley was asked by the Seattle Division if he would submit a letter "on company letterhead from his current employer stating he would not be involved in any criminal cases." *Id.* ¶ 68.

Mr. Tilley said he was not comfortable doing this, especially because he thought the FBI contributed to him losing his previous job with the government contractor. *Id.* And on July 2, 2024, the Seattle Division officials told Mr. Tilley that OIC would not forward his application for outside employment to DOJ. *Id.* The officials shared that they still supported his application and shared that with OIC. *Id.*

### B.    Procedural Background

The Plaintiffs sued the FBI and DOJ in this Court on September 4, 2024. *See* Compl., ECF No. 1. The Complaint has four counts. *See id.* Count 1 alleges that the Defendants' "requirements that the Plaintiffs follow the outside employment rules applicable to active paid employees while they are suspended from duty without pay violates the Fifth Amendment[.]" *Id.* ¶ 87. Count 2 alleges that the Defendants' application of those same requirements violates the Plaintiffs' "rights to free speech and association[.]" *Id.* ¶ 102. Count 3 alleges that "[w]hile the Plaintiffs are suspended without pay—although they have not lost their procedural and administrative rights to their employment—they are not employees under 5 U.S.C. § 2105, and the FBI and DOJ's requirements that the Plaintiff follow outside employment rules applicable to active paid employees violate the Administrative Procedure Act." *Id.* ¶ 113 (citing 5 U.S.C. §§ 706(2)(A), 706(2)(C)). Finally, Count 4 alleges that the Defendants' "failure to make a decision regarding [Mr.] Tilley's outside employment request since December 13, 2022, particularly while [Mr.] Tilley has been suspended indefinitely from duty without pay, violates the Administrative Procedure Act." *Id.* ¶ 122 (citing 5 U.S.C. § 706(1)). The Plaintiffs request both injunctive and declaratory relief, *id.* ¶¶ 123–27, as well as attorneys' fees, *id.* ¶ 128.

The Defendants filed a Motion to Dismiss on December 12, 2024. *See* Mot. Dismiss, ECF No. 11. They move to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of

subject matter jurisdiction for two reasons. *See* Mem. Supp. Mot. Dismiss at 9–18, ECF No. 11-1. First, they argue that the Plaintiffs lack Article III standing to pursue any of their claims. *See id.* at 10–16. Second, they argue that the CSRA precludes the Plaintiffs' APA claims. *See id.* at 16–18. They also move to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. *See id.* 18–25. The motion is fully briefed and ripe for review. *See* Opp'n, ECF No. 13; Reply, ECF No. 15.

## LEGAL STANDARDS

"A motion under Rule 12(b)(1) presents a threshold challenge to a court's jurisdiction." *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 585 F. Supp. 3d 63, 69 (D.D.C. 2022) (cleaned up). The plaintiff "bears the burden of providing by a preponderance of the evidence that the Court has subject-matter jurisdiction over her claims." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 69 (D.D.C. 2011). When evaluating a motion under Rule 12(b)(1), "the court may consider documents outside the pleadings to assure itself that it has jurisdiction." *Sandoval v. U.S. Dep't of Justice*, 322 F. Supp. 3d 101, 104 (D.D.C. 2018).

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether a complaint has properly stated a claim upon which relief may be granted." *Kursar v. Transp. Sec. Admin.*, 751 F. Supp. 2d 154, 163 (D.D.C. 2010). When deciding a Rule 12(b)(6) motion, the court must "treat the complaint's factual allegations as true" and "must grant [the] plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up). But the Court need not accept the plaintiff's "legal conclusions cast in the form of factual allegations." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (cleaned up). And the court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which

[it] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

## DISCUSSION

The Defendants move to dismiss this case under both Rule 12(b)(1) and 12(b)(6). After reviewing the briefs and the record closely, the Court concludes that the Plaintiffs lack Article III standing for all of their claims, with one exception. The Court also concludes that the APA claims are precluded by the CSRA. The Court therefore dismisses those claims under Rule 12(b)(1). The only exception is the Plaintiffs' Fifth Amendment claim, which is not a model of clarity. If the Court construes that claim as challenging Mr. Kobelia's removal from the FBI rolls on procedural due process grounds, then the Court finds standing. Unfortunately for the Plaintiffs, they offered this theory for the first time in their Opposition, and so the Court dismisses it under Rule 12(b)(6).

### A.    Standing

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *Id.* (cleaned up). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). "A motion to dismiss for lack of standing proceeds under Rule 12(b)(1) because 'the defect of standing is a defect in subject matter jurisdiction.'" *Conf. of State Bank Supervisors v. Off. of the Comptroller of the Currency*, 313 F. Supp. 3d 285, 294 (D.D.C. 2018) (quoting *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987)).

"As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing." *TransUnion*, 594 U.S. at 430–31 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek[.]" *Id.* at 431 (citing *Davis v. FEC*, 554 U.S. 724, 734 (2008); *Laidlaw*, 528 U.S. at 185). The Court will therefore assess standing for each claim brought by the Plaintiffs.[1]

### 1.    Fifth Amendment Claim

The Plaintiffs first allege that application of the "outside employment rules applicable to active paid employees while they are suspended from duty without pay violates the Fifth Amendment[.]" Compl. ¶ 87. The Complaint does not explain why, but it provides a clue by citing *Greene v. McElroy*, 360 U.S. 474 (1959), for the proposition that "[t]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment." Compl. ¶ 86 (quoting *Greene*, 360 U.S. at 492). The reference to liberty and property suggests that the Plaintiffs are asserting a due process claim. *See* U.S. Const. amend. V. And the citation to *Greene* suggests that it is a *procedural* due process claim challenging the outside-employment approval process. *See* 360 U.S. at 493 (identifying the issue as whether the government could create a program wherein persons "may be restrained in following their chosen professions on the basis of fact determinations . . . made in proceedings in which they are denied the traditional procedural safeguards of confrontation and cross-examination").

---

[1] The Court will not address the Plaintiffs' request for "[c]osts and attorney fees." Compl. ¶ 128. "[An] interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990) (citation omitted).

Oddly enough, the Plaintiffs never advance this argument in their Opposition. They instead argue that the Fifth Amendment has been violated in three ways. *See* Opp'n at 30–37. First, they argue that Mr. Kobelia has a property interest in his FBI employment, thereby making his removal from the FBI rolls without a hearing a procedural due process violation. *See* Opp'n at 36–37. Second, they cite *Greene*—a procedural due process case—to argue that the Defendants have violated their substantive due process rights to follow a chosen profession, *see* Opp'n at 31–33 (citing *Truax v. Raich*, 239 U.S. 33, 41 (1915)), to pursue specific private employment, *see id.* at 33 (citing *Geene*, 360 U.S. at 492), and even to engage in "public employment under certain conditions," *id.* at 33 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)). And third, they suggest that the challenged regulations restrict their intangible property interest in outside employment in violation of the Takings Clause. *See* Opp'n at 35–36 (citing *First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles*, 482 U.S. 304, 322 (1987)). This scattershot briefing highlights just how unclearly the Plaintiffs pleaded their Fifth Amendment claim, posing interesting questions under Rule 12(b)(6). *See Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) ("A complaint must give the defendants notice of the claims and the grounds upon which they rest[.]"). Unsurprisingly, the Defendants urge dismissal on the merits given "the lack of sufficient notice regarding the precise Fifth Amendment interest asserted by the Plaintiffs." *See* Reply at 16. But the Court must first assure itself of jurisdiction. *ICC Evaluation Serv., LLC v. Int'l Assoc. of Plumbing and Mech. Offs., Inc.*, No. 16-cv-54, 2019 WL 8501430, at *2 (D.D.C. Nov. 22, 2019). So it will analyze whether the Plaintiffs have standing to bring any of these variations on its Fifth Amendment claim.

### a. Procedural Due Process (Outside Employment)

The Court first addresses what appears to be a claim that the Defendants violated procedural due process throughout the outside-employment approval process, though the Complaint is far from clear. *Cf.* Compl. ¶ 86 (citing *Greene*, 360 U.S. at 492); *see also id.* ¶ 56 ("Tilley has never been provided with a document that the request was either approved or denied."), *id.* ("The supervisor further stated the SAC would not provide a reason for why he could not approve the request."). The Plaintiffs seek to remedy this alleged violation through injunctive and declaratory relief. *See id.* ¶¶ 123–26. Because the Plaintiffs "must demonstrate standing separately for each form of relief sought," *Laidlaw*, 528 U.S. at 185, the Court will take each requested remedy in turn. Ultimately, the Plaintiffs lack standing to pursue such a Fifth Amendment claim.

*Injunctive Relief.* The Plaintiffs first appear to ask the Court to provide injunctive relief that would stop the Defendants from applying the outside-employment restrictions to them and from punishing them for their outside employment. *See* Compl. ¶¶ 125–26. "One recurring issue in our cases is determining when the threatened enforcement of a law creates an Article III injury." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). "[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007). "Instead, we have permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent." *Driehaus*, 573 U.S. at 159. "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)); *see also Matthew A. Goldstein, PLLC v. U.S. Dep't of State*,

851 F.3d 1, 4–5 (D.C. Cir. 2017) (applying *Driehaus* to a pre-enforcement action challenging potential application of a regulation); *Saline Parents v. Garland*, 630 F. Supp. 3d 201, 206–07 (D.D.C. 2022) (applying *Driehaus* to a pre-enforcement action challenging a policy announced by the Attorney General), *aff'd*, 88 F.4th 298 (D.C. Cir. 2023).

Pre-enforcement actions satisfying Article III often involve plaintiffs who have refrained from violating the challenged law out of fear of enforcement. *See, e.g.*, *Driehaus*, 573 U.S. at 155–56 ("COAST further alleged that it desires to make the same or similar statements about other federal candidates who voted for the ACA, but that fear of finding itself subject to the same fate as SBA has deterred it from doing so." (cleaned up)); *Green v. U.S. Dep't of Justice*, 392 F. Supp. 3d 68, 79 (D.D.C. 2019) ("They have been deterred from doing so because of the risk of prosecution under section 1201."); *Burke v. Wiedefeld*, No. 19-cv-3145, 2024 WL 3471241, at *4 (D.D.C. July 18, 2024) (identifying that the plaintiff has suffered the harm of "self-censorship").

But the Plaintiffs have not been so deterred. They have clearly violated the "rules . . . [that] require them to get approval from the FBI before taking a new job." Compl. ¶ 55; *see also* 5 C.F.R. § 3801.106(c)(1) (requiring approval for non-law enforcement work); 5 C.F.R. § 3801.106(b)(2) (permitting written waiver of prohibition on law enforcement work). Mr. Tilley began working for a government contractor in January 2022, just two weeks after initiating the approval process, Compl. ¶¶ 56–57, even though he "has never been provided with a document that the request was either approved or denied," *id.* ¶ 56. And he accepted a job with LA Metro in December 2022 just six days after submitting a request for approval, *id.* ¶¶ 63–64, even though the Defendants have "fail[ed] to make a decision" about this request, *id.* ¶ 122; *see also id.* ¶¶ 68–69; Opp'n at 13 ("[Mr. Tilley] is being subjected to an ongoing process to obtain approval."). Mr. Kobelia has been

even bolder, accepting a job at the BOP in April 2024 without ever submitting any request for approval as the regulations require. *See* Compl. ¶¶ 76–77.

The Plaintiffs also seem to have ignored the "rules . . . barring them from taking a law enforcement position." *Id.* ¶ 55 (citing 5 C.F.R. § 3801.106(b)(1)). Mr. Tilley applied to work in the Orange County Sheriff's Department "as a trainee deputy sheriff" in August 2022, *id.* ¶ 59, and he "tried to apply for his previous position as a state trooper with the Arizona Department of Public Safety" in early 2024, *id.* ¶ 67. While Mr. Tilley disputes whether his current employment with LA Metro "fits the definition of restricted law enforcement employment[] since he does not handle criminal or habeas corpus matters," Opp'n at 39 n.12, he has also demonstrated an awareness that this job touches on the purview of 5 C.F.R. § 3801.106(b), *see* Compl. ¶ 66 ("Tilley submitted a request for a waiver of outside employment requirements under 5 U.S.C. § 3801.106(b)(2)."); Opp'n at 39 n.12 ("[S]ince the FBI claims he cannot take the job because it suspects it might involve criminal or habeas corpus matters, for the purposes of this motion only, Tilley will assume that the job meets the FBI's definition of restricted law enforcement work."); *id.* at 41 (arguing that the prohibition on restricted law enforcement work threatens the public's interest in seeing Tilley work at LA Metro). And Mr. Kobelia expressly says that he took his BOP job so he could "continue his law enforcement career." Compl. ¶ 77; *see also id.* ¶ 99 (same).

The Plaintiffs are hard-pressed to argue that there is a "substantial risk" of future enforcement or that such enforcement is "certainly impending." *Driehaus*, 573 U.S. at 159 (quoting *Clapper*, 568 U.S. at 414 n.5). At the time the Complaint was filed, Mr. Tilley had enjoyed nearly continuous outside employment for a little over two and a half years, Compl. ¶¶ 57, 61, 64, and Mr. Kobelia had done the same for almost five months, *id.* ¶ 77. And at no point do they allege any plans to change course. These are not the actions of people worried about

enforcement. *See, e.g.*, *Manafort v. U.S. Dep't of Justice*, 311 F. Supp. 3d 22, 36 (D.D.C. 2018) ("[T]his case does not allege that Manafort's own conduct will be chilled in any way by the possibility of future prosecution." (citations omitted)); *Doe v. U.S. Dep't of Health & Hum. Servs.*, 85 F. Supp. 3d 1, 12 (D.D.C. 2015) ("[T]he plaintiff has no standing to pursue this claim since she has not demonstrated that her actions, or any imminent actions she intends to take, have been affected by VAWA's Section 304 or the actions of the defendants."). Nor have the Plaintiffs proffered any "factual allegations that support[] concrete threats of enforcement." *Saline Parents v. Garland*, 88 F.4th 298, 304–05 (D.C. Cir. 2023) (citations omitted), *cert. denied*, 145 S. Ct. 144 (2024); *see, e.g.*, *Driehaus*, 573 U.S. at 166 (alleging "an intent to engage in the same speech that was the subject of a prior enforcement proceeding"); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (alleging plaintiff had "been told by the police" that "he will likely be prosecuted" if he kept hand-billing); *Dombrowski v. Pfister*, 380 U.S. 479, 487–88 (1965) (alleging appellant and intervenors had previously been arrested and charged with violating the challenged statutes).

The Plaintiffs marshal three arguments for why they have satisfied the injury-in-fact element of standing. *See* Opp'n at 9–16. But the Court is not convinced by any of them.

1. The Plaintiffs first argue that "[t]he Defendants' unlawful asserted regulation alone is sufficient for the Plaintiffs to meet the injury-in-fact requirements[.]" Opp'n at 10. They point out that "there is ordinarily little question that a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under which it is regulated." Opp'n at 9 (quoting *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (cleaned up)). And they cite two cases where frequent flyers were able to challenge the Transportation Security Administration's authority to impose requirements on them. *See* Opp'n at 10 (citing *Bonacci v. TSA*, 909 F.3d 1155, 1157 (D.C. Cir. 2018) (commercial pilot challenging the selection and screening of crewmembers

"in the same manner as passengers"); *Corbett v. TSA*, 19 F.4th 478, 483 (D.C. Cir. 2021) (frequent passenger challenging COVID-19 mask mandate)).

But both of those cases involved plaintiffs who had previously been forced to follow the regulations and thus were likely to be put in the same position in the future. *See Corbett*, 19 F.4th at 483 ("[The plaintiff] is a frequent flyer and he currently has future travel booked where he will again face compelled compliance with the Mask Directives under the credible threat of enforcement."); *Bonacci*, 909 F.3d at 1157 ("On several unspecified occasions in 2017, Bonacci was randomly selected for passenger screening when reporting for his assigned duties."). The Plaintiffs in this case, on the other hand, have not conformed their behavior to the outside employment restrictions. They say that they have "attempted to comply with these restrictions by submitting requests and/or speaking with FBI lawyers before taking [their] other jobs." Opp'n at 10. But neither has waited for the required approval, *see* 5 C.F.R. § 3801.106(c)(1); 5 C.F.R. § 3801.106(b)(2); Compl. ¶ 55 (acknowledging requirement), and Mr. Kobelia never even submitted a formal request for his current role, *see id.* ¶¶ 76–77.

2. The Plaintiffs next argue that Mr. Kobelia suffered an injury-in-fact when he was removed from the FBI rolls. *See* Opp'n at 10–11 (citing Compl. ¶ 78). But "because Plaintiffs seek injunctive relief[,] . . . past harm is not sufficient to establish an injury in fact." *Nat'l Whistleblower Ctr. v. Dep't of Health & Hum. Servs.*, 839 F. Supp. 2d 40, 45–46 (D.D.C. 2012) (citation omitted); *see also Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 527 F. Supp. 2d 101, 105 (D.D.C. 2007) ("That CREW has adequately alleged a past injury-in-fact, however, does not in of itself give CREW standing to seek prospective relief." (citation omitted)). And even if it were sufficient, an injunction barring the Defendants from applying the outside-employment restrictions

to the Plaintiffs or punishing them for their outside employment would not provide redress for Mr. Kobelia's removal.

3. The Plaintiffs finally argue that Mr. Tilley faces "a substantial threat of future disciplinary action" for violating the outside-employment restrictions. Opp'n at 12. They point to two main facts to support this claim. The first is that "[Mr.] Tilley has learned about [Mr.] Kobelia's removal from the rolls of the FBI." Opp'n at 13. They frame Mr. Kobelia's removal as punishment for his outside employment, *see id.* at 12, and they argue that this "past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" Opp'n at 13 (quoting *Driehaus*, 573 U.S. at 164). But Mr. Kobelia accepted another federal position, and the Plaintiffs acknowledge in their Complaint that Mr. Kobelia's removal "resulted" from the fact that "the FBI Human Resources Division considered [Mr.] Kobelia transferred to another federal government agency[.]" Compl. ¶ 78 ("Thus, he was removed from the rolls of the FBI."). Since Mr. Tilley works for a local entity, he is not at risk of being treated as if he transferred to another federal agency. As far as removal is concerned, the two Plaintiffs have not engaged in the "same conduct." *Driehaus*, 573 U.S. at 164.

The second fact they point to is that Mr. Tilley is allegedly "facing disciplinary action by the FBI." Opp'n at 12. This appears for the very first time in the Plaintiffs' Opposition. *See id.* "Under settled law, the District Court may in appropriate cases dispose of a motion to dismiss for lack of subject matter jurisdiction under [Federal Rule of Civil Procedure] 12(b)(1) on the complaint standing alone." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). And it does not appear that any exception cited by the Plaintiffs applies here. This is not an "undisputed fact[] evidenced in the record[.]" *Id.* The Plaintiffs themselves seem to dispute whether there has been any disciplinary action taken against either of them. *See* Opp'n at 26

(arguing that the CSRA does not preclude their APA claims "since . . . no disciplinary action has been taken"). And the Defendants seem skeptical as well. *See* Reply at 6 ("Plaintiffs . . . raise for the first time an unspecified 'disciplinary action' purportedly taken against Mr. Tilley—again without explaining what the purported action has to do with the challenged rules."). Nor is it a "particularized allegation[] of fact." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). The Plaintiffs share no details as to whether this alleged disciplinary action concerns Mr. Tilley's outside employment. *See* Decl. ¶ 10. If anything, they have said the opposite. *See* Opp'n at 26 (insisting for preclusion purposes that the FBI has not "taken administrative disciplinary action against [the] Plaintiffs for taking outside employment while indefinitely suspended"). The Court therefore does not consider this allegation.

 *Declaratory Relief*. The Plaintiffs also request a declaration that the Defendants' actions violated the Constitution and that the Plaintiffs are not subject to the outside-employment restrictions. *See* Compl. ¶¶ 123–24. But these declarations fail on the injury-in-fact element for the same reasons as the injunctive relief. *See Randhawa v. DHS*, No. 22-cv-3291, 2024 WL 578957, at *2 (D.D.C. Feb. 13, 2024) ("A declaration that the defendants violated his constitutional rights" is "prospective relief" that requires the plaintiff to show "that he will likely . . . suffer future injury." (cleaned up)); *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987) ("Although *Lyons* and its predecessors involved injunctive relief, whereas Haase seeks declaratory relief, we do not distinguish *Lyons* on this basis. Lyons did not have standing because he failed to establish a sufficient likelihood of future injury." (citation omitted)). The Plaintiffs cannot show that they will likely suffer future injury given they have been violating the terms of the outside-employment restrictions for quite some time—one of them for over two and a half years at the time of the Complaint—without any hint of future enforcement. *See supra*, at 14–20.

### b. Procedural Due Process (FBI Employment)

The Plaintiffs next appear to challenge Mr. Kobelia's removal from the FBI rolls on procedural due process grounds. Although the Complaint does not signal such a claim, the Plaintiffs argue for the first time in their Opposition that FBI employees have "a protected property interest in [their] FBI employment" because of "various internal procedural protections" afforded to them prior to removal. Opp'n at 37 (citing *Ashton v. Civiletti*, 613 F.2d 923, 928–31 (D.C. Cir. 1979)). And they argue that the FBI violated Mr. Kobelia's procedural due process rights by removing him from the FBI rolls without a hearing, thereby depriving him of his property interest in continued employment with insufficient process. *See id.* (citing *Loudermill*, 470 U.S. at 542). They ask the Court to remedy this violation by "ordering [Mr.] Kobelia's reinstatement to the 'rolls' of the FBI." *Id.* ¶ 127.[2]

Standing does not pose a bar to this claim. Mr. Kobelia suffered an injury-in-fact when he was removed from the rolls, and the removal continues to "complicate[] his efforts to be reinstated in the FBI." Opp'n at 11. His injury is traceable to the challenged action as presently construed, which is that the Defendants violated procedural due process by removing Mr. Kobelia from the rolls without a hearing. *See* Opp'n at 37. And reinstatement would redress his injury of removal. *See McKoy v. Spencer*, No. 16-cv-1313, 2019 WL 400615, at *6 (D.D.C. Jan. 31, 2019) ("Plaintiff's requested remedy of reinstatement would grant relief for her injury of separation from the Navy allegedly caused by the Defendant."); *Anderson v. Duncan*, 20 F. Supp. 3d 42, 51–52

---

[2] It is not clear from the Complaint or the Opposition whether this claim should run against both Defendants or just the FBI. The Complaint says that "[t]he FBI removed [Mr.] Kobelia from the 'rolls' of the FBI[.]" Compl. ¶ 85. Then the Opposition says in a heading that *the Defendants* violated Mr. Kobelia's procedural due process rights by removing him from the rolls. Opp'n at 36. But even the Opposition ultimately says that "the FBI removed [Mr.] Kobelia from the FBI's rolls." *Id.* at 37. The answer to this question is immaterial, so the Court will assume that the claim runs against the FBI alone.

(D.D.C. 2013) (concluding that "separation from federal service" "likely will be redressed" by "reinstatement"), *amended*, No. 06-cv-1565, 2013 WL 12328768 (D.D.C. Nov. 15, 2013).

### c. Substantive Due Process

The Court next addresses the claim that the Defendants violated the Plaintiffs' substantive due process rights by subjecting them to the outside-employment restrictions, although again, it is unclear that the Complaint sufficiently pleads such a claim. *See* Opp'n at 32–35. The Plaintiffs claim in their Opposition that the Defendants burdened their right to "follow[] a chosen profession free from unreasonable government interference," Opp'n at 32, to pursue "specific private employment," *id.* at 33, and to engage in "public employment under certain circumstances," *id.* at 33, all without any "proper government objective" to justify the restrictions, *id.* at 34–35 (quoting *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954)). The Plaintiffs seek both injunctive and declaratory relief, *see* Compl. ¶¶ 123–26, but they lack standing.

*Injunctive Relief*. The Plaintiffs first seek injunctive relief that would protect them from future enforcement of the outside-employment restrictions. *See* Compl. ¶¶ 125–26. But for all the same reasons that were explained above, they have not alleged an injury-in-fact sufficient to justify this injunctive relief. *See supra*, at 14–20.

*Declaratory Relief*. The Plaintiffs also ask the Court to issue a declaration that the Defendants violated the Constitution and that the Plaintiffs are not subject to the outside-employment restrictions. *See* Compl. ¶¶ 123–24. But, again, these declarations fail on the injury-in-fact element for the same reasons as the injunctive relief. *See Randhawa*, 2024 WL 578957, at *2; *Haase*, 835 F.2d at 911; *see also supra*, at 20.

22

#### d.  Takings Clause

In a passing comment in the Opposition, the Plaintiffs argue that they have an intangible property right to outside employment and that restrictions on that outside employment without pay amount to an unconstitutional taking. *See* Opp'n at 35–36. But they acknowledge that they are not seeking the relief that would remedy the harm caused by such a taking—backpay, *see id.* at 36— so they lack standing to bring such a claim as well. *See Laidlaw*, 528 U.S. at 180–81 (saying Article III standing requires plaintiffs to show "it is likely, not merely speculative, that the injury will be redressed by a favorable decision.").

### 2.    First Amendment Claim

The Plaintiffs next allege that the Defendants' "requirements that Plaintiffs not take a law enforcement job or any job that could involve a criminal matter while they are suspended from duty without pay violates their First Amendment rights to free speech and association[.]" Compl. ¶ 102. As to their freedom of expression, the Plaintiffs contend that "[a] decision to work for a law enforcement agency expresses support for the Constitution, American government agencies, and the rule of law." Opp'n at 39–40. And they question whether the government has an adequate justification for restricting this expressive conduct. *See id.* at 41; *see also Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563, 568 (1968). As to their freedom of association, they argue that the personal relationships involved in law enforcement resemble "protected intimate relationship[s]" because "law enforcement agencies are selective, require background checks, have a specified purpose to serve the public, . . . regulate and discipline members," and engender bonds formed by "a shared purpose and shared dangers." Opp'n at 40–41. And they argue that the Constitution constrains the government's ability to regulate such personal relationships. *See id.* at 40 (citing *Roberts v.*

*U.S. Jaycees*, 468 U.S. 609, 617–18 (1984)). They seek to remedy this violation through injunctive and declaratory relief. *See* Compl. ¶¶ 123–26.

    *Injunctive Relief*. The Plaintiffs first ask for injunctive relief that would "protect them from future disciplinary action." Opp'n at 21; *see also* Compl. ¶¶ 125–26. This sort of "pre-enforcement review" is permitted "under circumstances that render the threatened enforcement sufficiently imminent." *Driehaus*, 573 U.S. at 159. Whether enforcement is sufficiently imminent is a question "of degree and is not discernible by any precise test." *Johnson v. District of Columbia*, 71 F. Supp. 3d 155, 160 (D.D.C. 2014) (citing *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). Courts must instead wade through "a factual and case-specific determination" to figure out if pre-enforcement review is appropriate. *Id.* (quoting *Navegar, Inc. v. United States*, 103 F.3d 994, 999 (D.C. Cir. 1997)). The D.C. Circuit has tried to streamline this inquiry by giving pride of place to First Amendment claims. *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 739 (D.C. Cir. 2016). But since the Plaintiffs have not been deterred from seeking outside law enforcement employment—the conduct they argue is expressive and associative—they cannot plausibly allege that they have suffered an injury-in-fact sufficient for a pre-enforcement First Amendment challenge.

    The Supreme Court has "held that a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Driehaus*, 573 U.S. at 159 (quoting *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979)). This holding came in the First Amendment context, *see id.* at 154; *Babbitt*, 442 U.S. at 301, and the Court has defended it by citing to First Amendment pre-enforcement challenges, *see Driehaus*, 573 U.S. at 159–61 (citing *Babbitt*, 442 U.S. at 301, *Steffel*, 415 U.S. 452 (1974); *Virginia v. Am.*

*Booksellers Assn. Inc.*, 484 U.S. 383 (1988); *Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010)). But it has been extended beyond First Amendment claims. *See Seegars v. Gonzalez*, 396 F.3d 1248, 1251 (D.C. Cir. 2005) (Second Amendment); *Angelo v. District of Columbia*, 648 F. Supp. 3d 116, 123 (D.D.C. 2022) (same). And lower courts have invoked it for First Amendment challenges to regulations and guidelines as well. *See U.S. Telecom Ass'n*, 825 F.3d at 740; *Burke*, 2024 WL 3471241, at *3; *WallBuilder Presentations v. Clarke*, No. 23-cv-3695, 2024 WL 2299581, at *19 (D.D.C. May 21, 2024).

The D.C. Circuit has added a gloss to this tripartite test. In *Seegars v. Gonzalez*, it bemoaned the opacity of the prong requiring a credible threat of enforcement, arguing that "the adjective 'credible' says little or nothing about the requisite level of probability of enforcement, and clarity prevails only at the poles." 396 F.3d at 1252. But it noted that courts faced with First Amendment claims are often satisfied if the "plaintiffs' intended behavior is covered by the statute and the law is generally enforced." *Id.* at 1252 (collecting cases). The D.C. Circuit later recognized that this observation "implied . . . that standing to challenge laws burdening expressive rights requires only 'a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law.'" *ANSWER v. District of Columbia*, 589 F.3d 433, 435 (D.C. Cir. 2009) (quoting *Seegars*, 396 F.3d at 1253). And it finally adopted this rule wholesale in *United States Telecom Association v. FCC*, when it recited the test and applied it to the plaintiff before the Court. *See* 825 F.3d at 739–40; *see also Green*, 392 F. Supp. 3d at 83 (noting that *United States Telecom Association* "seems to confirm" this rule), *aff'd*, 111 F.4th 81 (D.C. Cir. 2024).

This relaxed test for First Amendment pre-enforcement challenges builds on decades of "special solicitude" for such claims. *U.S. Telecom Ass'n*, 825 F.3d at 740 (citation omitted);

*see also N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135–36 (D.C. Cir. 2015) ("For many decades, the courts have shown special solicitude to pre-enforcement challenges brought under the First Amendment, relaxing standing requirements and fashioning doctrines . . . meant to avoid the chilling effects that come from unnecessarily expansive proscriptions of speech." (citations omitted)). "The Supreme Court has . . . warned that delay in decision of First Amendment claims typically exacerbates speech-related harm." *N.Y. Republican State Comm.*, 799 F.3d at 1136 (citing *Freedman v. Maryland*, 380 U.S. 51, 57–59 (1965)). As a result, "courts' willingness to permit pre-enforcement review is at its peak when claims are rooted in the First Amendment." *U.S. Telecom Ass'n*, 825 F.3d at 740 (quoting *N.Y. Republican State Comm.*, 799 F.3d at 1135).

This all looks very promising for the Plaintiffs. Taken at face value, they need only provide "a credible statement" that they intend to violate the outside-employment restrictions and plausibly allege "a conventional background expectation that the government will enforce the law." *Id.* at 739. The first requirement requires some indication of intent, *see Atlas Brew Works, LLC v. Barr*, 820 F.App'x 4, 7 (D.C. Cir. 2020), but not much, *see U.S. Telecom Ass'n*, 825 F.3d at 739–40 (reasoning that a declaration stating that the challenged rules "eliminate [the plaintiff's] discretion" to engage in allegedly protected conduct "indicates that, were it not for the rules," the plaintiff would engage in that conduct). And the second requirement is satisfied where the government has previously enforced the challenged law and has not disavowed enforcement against the plaintiffs. *See Green*, 392 F. Supp. 3d at 84; *but see Johnson v. District of Columbia*, 71 F. Supp. 3d 155, 162 (D.D.C. 2014) ("'[T]his conventional background expectation' of enforcement may be overcome where the law is moribund or of purely 'historical curiosity.'" (quoting *Navegar*, 103 F.3d at 1000)). So the test seems to be quite forgiving.

26

But it appears that this special path to a pre-enforcement injury-in-fact does not apply when the challenger's expressive conduct has not been chilled. One court in this District has said that "a subjective chill of First Amendment rights, *paired with* a credible threat of imminent, adverse government action against the claimant, may create a cognizable injury." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 359 (D.D.C. 2020) (emphasis added) (citing *Driehaus*, 573 U.S. at 159; *U.S. Telecom Ass'n*, 825 F.3d at 739; *ANSWER*, 589 F.3d at 435). And this makes sense upon closer inspection. *United States Telecom Association* spoke broadly when it laid down the rule that "standing to challenge laws burdening expressive rights requires only a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law." 825 F.3d at 739 (cleaned up). But the plaintiff in that case was deterred from engaging in expressive conduct. *See id.* at 739–40. And when the D.C. Circuit concluded that the test had been satisfied, it explained that the plaintiff's "*inability* to follow through on [its] intention" to engage in that expressive conduct "constitute[d] an injury in fact for purposes of pre-enforcement review of the rules." *Id.* at 740 (emphasis added). The Plaintiffs in this case, on the other hand, have been able to engage in their purportedly protected conduct. They both hold jobs that they argue involve the First Amendment interests threatened by the Defendants' outside-employment restrictions. *See* Opp'n at 38–42. So they cannot claim the injury-in-fact contemplated by *United States Telecom Association*.

This tracks how the case law has developed. The courts recognizing standing for First Amendment pre-enforcement actions routinely note that the plaintiff has been deterred from engaging in the expressive conduct proscribed by the challenged legal rule. *See, e.g.*, *U.S. Telecom Assoc.*, 825 F.3d at 739–40; *Green*, 392 F. Supp. 3d at 79 ("They have been deterred from doing so because of the risk of prosecution under section 1201."); *Burke*, 2024 WL 3471241, at *4

(identifying that the plaintiff has suffered the harm of "self-censorship"). And courts have held that plaintiffs lack standing when their conduct has not been deterred. *See, e.g.*, *Manafort*, 311 F. Supp. 3d at 36 ("[T]his case does not allege that Manafort's own conduct will be chilled in any way by the possibility of future prosecution." (citations omitted)); *Doe*, 85 F. Supp. 3d at 12 ("[T]he plaintiff has no standing to pursue this claim since she has not demonstrated that her actions, or any imminent actions she intends to take, have been affected by VAWA's Section 304 or the actions of the defendants.").

In sum, the D.C. Circuit has provided a special doctrinal path for pre-enforcement First Amendment plaintiffs to show an injury-in-fact. *See U.S. Telecom Ass'n*, 825 F.3d at 739. But that path just allows plaintiffs to argue that their "inability" to engage in protected conduct satisfies the injury-in-fact element for prospective relief. *Id.* at 740. The Plaintiffs have been able to engage in their allegedly protected conduct; indeed, they were still engaging in that conduct at the time of the Complaint. *See supra*, at 15–17. So they lack standing to seek an injunction barring application of the outside-employment restrictions and punishment for outside employment.

*Declaratory Relief*. The Plaintiffs also ask the Court to provide a declaration that the Defendants violated the Constitution and that the Plaintiffs are not subject to the outside-employment restrictions. Compl. ¶¶ 123–24. But this request fails on the injury-in-fact element for the same reasons that the Court cannot enjoin the application and enforcement of the outside-employment restrictions. *See Randhawa*, 2024 WL 578957, at *2; *Haase*, 835 F.2d at 911; *see also supra*, at 20.

### 3.    APA Claims

Finally, the Plaintiffs allege two different APA claims. The first is a Section 706(2) challenge to an agency action. *See* Compl. ¶¶ 103–13. And the second is a Section 706(1) challenge to an agency inaction. *See* Compl. ¶¶ 114–22. The Court finds no standing as to either claim.

### a.  Agency Action

The Plaintiffs first allege that while they are suspended without pay, "they are not employees under 5 U.S.C. § 2105, and the [Defendants'] requirements that the Plaintiff[s] follow outside employment rules applicable to active paid employees violate the [APA]." Compl. ¶ 113 (citing 5 U.S.C. §§ 706(2)(A), 706(2)(C)). But they never clearly identify the agency action being challenged. The Court gleans that they do not challenge the regulations themselves based on the following statement in their Opposition: "[The] Plaintiffs here do not challenge rulemaking, they challenge its application to them while they are suspended from employment." Opp'n at 28. But even this leaves riddles to solve. First, they never identify the antecedent of "its," leaving the Court to guess which outside-employment rules are at issue. Second, and more importantly, they never say *how* "it" has been, is being, or will be applied. Drawing all inferences in the Plaintiffs' favor, the Court construes this claim to be a pre-enforcement challenge to some final agency action.

"The test for APA standing . . . requires . . . that the plaintiff meet the traditional requirements of Article III standing." *Validata Chem. Servs. v. U.S. Dep't of Energy*, 169 F. Supp. 3d 69, 79–80 (D.D.C. 2016) (cleaned up). The Plaintiffs seek both injunctive relief and declaratory relief. *See* Compl. ¶¶ 123–26. And the Court finds no standing as to either remedy. First, the Plaintiffs seek an injunction that would protect them from future enforcement and punishment. *See* Compl. ¶¶ 125–26. But as the Court has explained, they have failed to allege an injury-in-fact sufficient to support this relief. *See supra*, at 14–20; *see also Council on Radionuclides &*

*Radiopharmaceuticals, Inc. v. Azar*, No. 18-cv-633, 2019 WL 5960142, at *1, 3 (D.D.C. Nov. 14, 2019) (applying *Driehaus* to an APA claim challenging an agency interpretation of a statute). Second, the Plaintiffs ask the Court to provide declaratory relief. *See* Compl. ¶¶ 123–24. But this fails on the injury-in-fact element for the same reasons as the injunctive relief. *See supra*, at 20; *see also Randhawa*, 2024 WL 578957, at *2; *Haase*, 835 F.2d at 911.

### b. Agency Inaction

They next allege that the Defendants' "failure to make a decision regarding [Mr.] Tilley's outside employment request since December 13, 2022, particularly while [Mr.] Tilley has been suspended indefinitely without pay, violates the [APA]." Compl. ¶ 122 (5 U.S.C. § 706(1)). They claim that this amounts to "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *see also* Compl. ¶¶ 114–122. But there is no standing to bring this claim because the Complaint does not plausibly allege an injury-in-fact.

"To satisfy Article III, a procedural harm 'must be tethered to some concrete interest adversely affected by the procedural deprivation.'" *Ameer v. Schofer*, No. 23-cv-3066, 2024 WL 2831464, at *2 (D.D.C. June 4, 2024) (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)). A procedural harm of delay is sufficient when it "has caused cognizable downstream harms." *Id.* At the time of the Complaint, Mr. Tilley had waited nearly two and a half years for the FBI to decide if he may work with LA Metro. *See* Compl. ¶¶ 116–122. Drawing all inferences in his favor, it appears that during that time, he has not been "able to access any medical benefits offered to him as a federal employee." Compl. ¶ 40. But it is not clear how this concrete interest is downstream of the delayed decision about his work at LA Metro; it seems more downstream of the delayed investigation that caused his suspension in the first place, which Mr. Tilley does not challenge, *see* Opp'n at 25 n.6; *see, e.g.*, *Ameer*, 2024 WL 2831464 at *2

("Because of the delay, she has been forced to take 'unpaid leave' and faces 'termination if her visa is not obtained soon.'"). Even if the Defendants were to approve his request, he would be in the exact same position as he is in today: working at LA Metro without access to his federal medical benefits.

B.    **Preclusion**

Separate from standing, the Court also concludes that the Plaintiffs' APA claims are precluded by the CSRA. The Court therefore dismisses those claims under Rule 12(b)(1) on this alternative ground. *See, e.g.*, *Mapes v. Reed*, 487 F. Supp. 3d 20, 24 (D.D.C. 2020).

The CSRA "establishes a framework for evaluating personnel actions taken against federal employees." *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012). "To reform the "outdated patchwork of statutes and rules built up over almost a century,' Congress created 'an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration.'" *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (quoting *United States v. Fausto*, 484 U.S. 439, 444 (1988)). "The CSRA protects covered federal employees against a broad range of personnel practices, and it supplies a variety of causes of action and remedies to employees when their rights under the statute are violated." *Id.*

To be clear, the CSRA does not always provide employees with a forum for review. "Chapter 75 of the CSRA governs adverse personnel actions based on misconduct." *Graham v. Ashcroft*, 358 F.3d 931, 933 (2004). Subchapter I "governs minor adverse personnel actions," *id.* (citing 5 U.S.C. §§ 7501–7504), defined as "a suspension for 14 days or less," *id.* (citing 5 U.S.C. § 7502), and it applies "only to employees in the 'competitive service,'" *id.* (citing 5 U.S.C. § 7501). Employees covered under Subchapter I are afforded certain procedural protections but

"no right to judicial review." *Id.* (citing 5 U.S.C. § 7503). Subchapter II, on the other hand, "governs major adverse personnel actions," *id.* (citing 5 U.S.C. §§ 7511–7514), defined as "removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less," *id.* (citing 5 U.S.C. § 7512). And "[e]mployees covered by Subchapter II are entitled to administrative review by the Merit Systems Protection Board (MSPB), and subsequent judicial review in the Court of Appeals for the Federal Circuit." *Id.* (citing 5 U.S.C. §§ 7513(d), 7701, 7703). But not all employees are covered under Subchapter II. *See* 5 U.S.C. § 7511.

"FBI employees are generally excluded from CSRA provisions." *Graham*, 358 F.3d at 933 (citing 5 U.S.C. §§ 2302(a)(2)(C)(ii), 7511(b)(8)). But "preference eligible" FBI employees are covered under Section II. *Id.* (citing 5 U.S.C. § 7511(a)(1)(B)). "Such 'preference eligible' employees are entitled to specific protections under the CSRA because of prior military experience." *Id.* (citing 5 U.S.C. § 2108(3)). According to the Complaint, neither Plaintiff in this case is preference eligible. *See* Compl. ¶¶ 8, 21.

The D.C. Circuit has held that "the CSRA is comprehensive and exclusive." *Grosdidier*, 560 F.3d at 497. "Federal employees may not circumvent the Act's requirements and limitations by resorting to the catchall APA to challenge agency employment actions." *Id.*; *see also Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009) ("[The D.C. Circuit has] long held that federal employees may not use the [APA] to challenge agency employment actions." (collecting cases)); *Mapes v. Reed*, 487 F. Supp. 3d 20, 24–25 (D.D.C. 2020) ("Courts have . . . consistently held that the CSRA review scheme is exclusive, as the Act constitutes the remedial scheme for federal employment and personnel complaints." (cleaned up)). This is true "even if the plaintiff cannot prevail in a claim under the CSRA." *Grosdidier*, 560 F.3d at 497; *see also Filebark*, 555 F.3d at 1010 ("[W]e have held that [the CSRA's] comprehensive employment scheme

preempts judicial review under the more general APA even when that scheme provides no judicial relief[.]"). After all, "Congress designed the CSRA's remedial scheme with care, intentionally providing—and intentionally not providing—particular forums and procedures for particular kinds of claims." *Grosdidier*, 560 F.3d at 497. In other words, "what you get under the CSRA is what you get." *Id.* (quoting *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (Roberts, J.)). The Plaintiffs try to circumvent this clear holding in four different ways. But none is convincing.

*First*, they argue that their third claim is effectively a constitutional claim because resolving it will involve the canon of constitutional avoidance. *See* Opp'n at 23–24. This matters because the Parties seem to agree that the CSRA does not preclude "constitutional claims that cannot be heard through the CSRA review scheme." *Id.* at 23; *see also id.* ("[The] Defendants correctly have *not* argued that the CSRA precludes review of [The] Plaintiffs' constitutional claims[.]"); Reply (not responding to this contention); *McCabe v. Barr*, 490 F. Supp. 3d 198, 211–12 (D.D.C. 2020) (deciding it has jurisdiction over constitutional claims when the defendants agreed that the CSRA did not preclude them). But as the Plaintiffs acknowledge, their third claim "is primarily a question of statutory construction." Opp'n at 23. This is because it argues that the Plaintiffs do not meet the statutory definition of "employee," Compl. ¶ 113 (citing 5 U.S.C. § 2105), thereby alleging that the Defendants' application of the outside-employment restrictions to the Plaintiffs violated the APA, *id.* (citing 5 U.S.C. §§ 706(2)(A), 706(2)(C)). And statutory claims do not become constitutional claims by virtue of the canons. So the Plaintiffs cannot wedge this claim into the constitutional category.

*Second*, they argue that their APA claims "do not arise out of any employment action as envisioned by the CSRA." Opp'n at 24. But these claims appear to arise from their indefinite suspensions without pay. *See* Compl. ¶¶ 113 (claim arose "[w]hile the Plaintiffs are suspended

without pay"), 122 (failure to make a decision, "particularly while [Mr.] Tilley has been suspended indefinitely from duty without pay," violates the APA). And an indefinite suspension without pay is one of the adverse personnel actions listed in the CSRA. *See* 5 U.S.C. § 7512(2) (listing "a suspension for more than 14 days"). And even if the claims could be separated from the suspensions per se, they remain "inextricably tied to [their] employment relationship with the federal government" and are therefore preempted by the CSRA. *Franklin v. Bernhardt*, 763 F. App'x 678, 681 (10th Cir. 2019) (CSRA barred claim arising from denial of symbolic token of long-term government employment). CSRA preclusion extends to all "litigation of an employment matter under the APA[,] even where the complaint did not concern a *type* of personnel action covered by the CSRA." *Filebark*, 555 F.3d at 1013 (cleaned up).

The Plaintiffs cite two cases where statutory claims were not precluded by the CSRA. *See* Opp'n at 27–29. The first case is *Hudson v. American Federation of Government Employees*, 630 F. Supp. 3d 214 (D.D.C. 2022). There, a court in this District held that a claim that the plaintiff was removed from a leadership position of a union in violation of his right to free expression under the Labor-Management Reporting and Disclosure Act was not "of the type Congress intended to be reviewed within" the CSRA's structure. *Id.* at 217, 222 (cleaned up). It based this conclusion in part on the fact that the CSRA does not "directly regulate the internal governance procedures of a CSRA-covered union or the relationship between a union and its officers." *Id.* at 223. That logic does not apply here because while the CSRA might not contemplate claims about union leadership, it does cover claims about "federal employment disputes," *Filebark*, 555 F.3d at 1010. The Plaintiffs try to argue that they are similarly situated because they "have no other means to challenge" the Defendants' restrictions. Opp'n at 27. But *Hudson* expressly warned against reading it to support such a broad proposition. *See* 630 F. Supp. 3d at 223 ("In reaching that decision,

however, the Court does not purport to define the line between CSRA-preempted and non-preempted claims, nor does it suggest that the CSRA's failure to address a particular type of claim definitively answers the preemption question. Rather, this Court reaches a narrow conclusion in the context of Hudson's particular grievances in this case[.]"); *see also Filebark*, 555 F.3d at 1010 ("[W]e have held that [the CSRA's] comprehensive employment scheme preempts judicial review under the more general APA even when that scheme provides no judicial relief.").

The second case is *National Treasury Employees Union v. Whipple*, 636 F. Supp. 2d 63 (D.D.C. 2009). There, the court held that the CSRA did not preclude an APA claim challenging a regulation providing agencies with "unfettered discretion to use [Federal Career Intern Program] authority to fill vacancies in virtually any position, even those for which it is practicable to hold a competitive examination." *Id.* at 68, 71. It explained that the claim did "not seek individual relief for specific employee claims," suggesting it did not arise out of a "federal employment dispute." *Id.* at 69. But the same cannot be said here, where the Plaintiffs admit that they "do not challenge rulemaking" and instead "challenge [the restrictions'] application to them while they are suspended from employment." Opp'n at 28.

The Plaintiffs cannot get around *Whipple*'s limitations by arguing that they seek system-wide relief that goes beyond their individual situations. *See* Compl. ¶ 125 (requesting an injunction "prohibiting the FBI and DOJ from requiring *employees* who are suspended indefinitely from duty without pay" to abide by the outside-employment restrictions (emphasis added)). As *Whipple* itself points out, the CSRA precludes non-rulemaking challenges even when the plaintiffs "fram[e] their claims as a system-wide challenge rather than a challenge to individual determinations." 636 F. Supp. 2d at 69 (citing *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005). So *Whipple* does not move the needle either.

35

*Third*, they argue that their claims are not precluded because they were no longer FBI employees after being suspended indefinitely. *See* Opp'n at 24–26. They point to 5 U.S.C. § 2105 for the proposition that an "employee" must be "engaged in the performance of a Federal function under authority of law or an Executive act." Opp'n at 25. Since they are "not performing a federal function while suspended from duty," they argue that they are not employees under the CSRA. *Id.* But that definition of "employee" is only the statutory default. *See* 5 U.S.C. § 2105 ("For the purpose of this title, 'employee,' *except as otherwise provided by this section or when specifically modified*, means . . . ." (emphasis added)).

Later on, in Subchapter II of Chapter 75, which governs major adverse personnel actions, the statute defines "employee" to "mean[]" "an individual in the competitive service" or "an individual in the excepted service," regardless of whether they are preference eligible. 5 U.S.C. § 7511(a)(1). This covers nearly the whole universe of "civil service positions." 5 U.S.C. § 2103(a) (defining "excepted service" as "those civil service positions which are not in the competitive service or the Senior Executive Service"). And this definition draws no lines based on whether someone is engaged in a federal function. *See* 5 U.S.C. § 7511(a)(1). Nor would such a line make sense. By the Plaintiffs' logic, employees who have been removed from office are no longer employees under the CSRA, which would mean they could not appeal their removal to the Merit Systems Protection Board, *see* 5 U.S.C. § 7701 ("An *employee* . . . may submit an appeal[.]" (emphasis added)). But we know that covered employees may seek that form of relief after removal. *See, e.g.*, *Rickel v. Dep't of the Navy*, 31 F.4th 1358, 1362 (Fed. Cir. 2022) ("Mr. Rickel filed an appeal with the Merit Systems Protection Board alleging that his removal was the result of unlawful retaliation[.]"). So the Plaintiffs' reading cannot be correct.

*Fourth*, they argue that "[t]he FBI's assertion of authority beyond what is authorized by statute is reviewable under *Leedom v. Kyne*, 358 U.S. 184 (1958)." Opp'n at 29. But citing this doctrine amounts to a "Hail Mary pass." *Nyunt*, 589 F.3d at 449. It permits, "in certain limited circumstances, judicial review of agency action for alleged statutory violations even when a statute precludes review." *Id.* "Its scope, however, is quite narrow, requiring that (i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency has plainly act[ed] in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Mapes*, 487 F. Supp. 3d at 26 (cleaned up). The Plaintiffs argue that the Defendants acted contrary to the CSRA because they are not employees under the terms of the statute. *See* Opp'n at 29–30. But the Court has already explained why that is incorrect. *See supra*, at 36. The Plaintiffs also argue that the FBI has acted in "direct contravention of congressional intent" because 5 U.S.C. § 6329b "authorizes the FBI to place employees on investigate leave." Opp'n at 30. But this is not a winning argument either because a statutory authorization of certain conduct is not a mandatory prohibition on other conduct, which is what is required under *Leedom*. *See Mapes*, 487 F. Supp. 3d at 26. The CSRA therefore precludes the Plaintiffs' APA claims.

### C.   Merits

The only claim to survive Rule 12(b)(1) is the allegation that the FBI violated Mr. Kobelia's procedural due process rights by removing him from the FBI rolls without a hearing. *See* Opp'n at 36–37; *see supra*, at 21-22. But the Court dismisses this claim under Rule 12(b)(6) because the Plaintiffs raised it for the first time in the Opposition. *See Atherton*, 567 F.3d at 681.

"Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what

the . . . claim is and the grounds upon which it rests[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). And the sufficiency of a statement of a claim under "Rule 8(a)(2) may be tested by a motion to dismiss for failure to state a claim upon which relief can be granted" under "Rule 12(b)(6)." 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1203, Westlaw (database updated April 2025). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions[.]" *Twombly*, 550 U.S. at 555 (cleaned up).

The Plaintiffs' Fifth Amendment claim was too conclusory to provide the Defendants with fair notice of its grounds. It begins with a list of facts related to the Plaintiffs' suspensions. *See* Compl. ¶¶ 80–84. Then it states that Mr. Koblia was removed from the FBI rolls. Compl. ¶ 85. But it never says that the removal violated the Fifth Amendment. Instead, it concludes that "[t]he FBI and DOJ's requirements that the Plaintiffs follow the outside employment rules applicable to active paid employees while they are suspended from duty without pay violates the Fifth Amendment[.]" Compl. ¶ 87. This comes after stating that "[t]he right to hold specific *private* employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment[.]" Compl. ¶ 86 (emphasis added) (citing *Greene*, 360 U.S. at 492). Nowhere do the Plaintiffs say that Mr. Kobelia had a liberty or property interest in his FBI employment. So the Defendants had no way of knowing that Mr. Kobelia would advance a procedural due process claim for his removal from the FBI rolls in the Opposition, *see* Opp'n at 36–37. The Court therefore dismisses this claim under Rule 12(b)(6). *See Twombly*, 550 U.S. at 555.

**CONCLUSION**

For the foregoing reasons, the Court dismisses the Complaint.

Count 1 is dismissed under Rule 12(b)(1) for lack of standing, with one caveat. Construing Count 1 as advancing a procedural due process claim to vindicate Mr. Kobelia's removal from the FBI rolls, the Court finds standing for that claim. But the Court dismisses it under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The Court therefore dismisses Count 1 in toto.

The Court dismisses the remaining counts under Rule 12(b)(1) for lack of standing. It also dismisses Counts 3 and 4 under Rule 12(b)(1) on the alternative ground that they are precluded.

A separate order will issue.

                         _____

                         SPARKLE L. SOOKNANAN
                         United States District Judge

Date:  May 20, 2025